The first case this morning is 07-5070-2C v. United States. Mr. Guzman. Thank you, Your Honor. May it please the Court. The Court should conclude that the alleged contract documents undermine Plaintiff's goodwill claim. Moreover, if there was a breach of the goodwill promise, the trial court erroneously awarded Ben Franklin's market value and ignored the receivership surplus, turning first to the issue of liability. Now, a brief explanation of why the Plaintiffs failed to establish the existence of a contract. What I wanted to focus on during my argument is that even if there is a contract, as Plaintiffs claim, the alleged contract documents identified by the Plaintiffs are inconsistent with the goodwill promise. Like other Winstar cases, the Plaintiff made the equitable acquisition contingent upon receiving certain forbearances. And like other Winstar cases, the Federal Home Loan Bank were granted forbearances. But what sets this transaction apart from cases like Cal-Fed and LaVanna are that the Plaintiffs didn't ask for and didn't receive forbearances related to goodwill. Instead, they received three forbearances unrelated to goodwill and unrelated to the alleged breach. Now, the Plaintiffs have… I'm asking, Mr. Winstar, that's if you look, I guess, at 169 and 170… Yes, Your Honor. …of the joint appendix. Those are the forbearances that were involved, nothing more, nothing less? Yes, Your Honor. And if you look at 400, 179, you see that they make their acquisition contingent on receiving only those three forbearances. So they asked for those three, they received those three, and now they ask the court to reap in forbearances that they neither sought nor received. And the one that's… the critical one is goodwill amortization over a 40-year period. That is correct. That's what the dispute is about. It is. It's not about these other three forbearances. Let me answer just one, and this is just a housekeeping question. Obviously, if we affirm, then we get into the… we get into all the various damages issues, correct? Yes, Your Honor. If Your Honor means affirming on liability, yes. Now, on the other hand, assume for the moment we were not to affirm on liability, but were to say, and obviously this is hypothetical, that there was no contract in respect to goodwill. In the equitable transaction, Your Honor? Yes. Yes, Your Honor. Now, that would resolve… we wouldn't get into… well, let me ask you this. If we did that, to what extent would we still need to address damages, if at all, on disappeal? Because I know the Western transaction, you're not challenging liability on that. But to the various damages contentions relating to capital value, premium for controlling shareholder interest, what, if anything, would we have to do about that if we reversed on liability on the equitable transaction? Your Honor, I mean, you could vacate the rest of it. All of those alleged damages were assigned… first of all, the trial court rejected all of the plaintiff's requests for damages, so those are off the table. The trial court itself found these damages that we will discuss based on the conclusion that the breach caused the loss of the thrift. If the equitable goodwill would have been lost in a non-contractual way, so that the only contractual goodwill was the Western Heritage goodwill, that wouldn't have been enough to affect whether the thrift would or would not have failed. It would not… so it would not be relevant. These damages that the trial court assigned would not be relevant and they would be vacated. Your Honor. So the Western damages, if it went back, would they still get some damages for Western or how would that… Your Honor… Western transaction. All the damage claims have been rejected, so there's nothing else left. There would be no damages on Western. Western was a very small amount, 8.8 million in goodwill, I believe, as compared to the 8.8 million in goodwill that the plaintiffs had remaining at the time of the alleged breach. 280 of that approximately was equitable goodwill. So would we need to vacate and remand it then? Is there a dispute about whether the thrift would have failed had they still had the goodwill from the Western Heritage deal? And that the non-contractual equitable goodwill… I'm working off of Charles' head. Okay. Then I don't believe that there is, Your Honor, because it is only 8 million dollars and the testimony was that the thrift would have been without the… well, if you put that 8 million dollars of goodwill back, it's the thrift of the… It's still going to fail. It's still going to fail. So I believe that… Just out of curiosity, why don't they get interest? Is there a statute? I just noticed in Hansenburg before I came up here that the government can get interest on the tax-related back payment issues, but the thrift is not intended to interest on 12 years of immunity for all of their money. Your Honor, there is… How is that? Is there a statute or is it one of our cases? I didn't even notice the issue before I came up here. This Court has repeatedly held that interest is not available, that the government is not, that the sovereign is not waived sovereign immunity with respect to the assignment of interest in cases such as these. There are some cases that interest is provided for by statute, but these cases, the Court has uniformly said that there's no interest available. If we overruled that question, it seems like we're overruled, Patrick. Your Honor, we are addressing these as quickly as we possibly can. We are down to 17, I believe, Windstar cases. The Anderson… So, looking back at the liability decision, the court in Anderson, the holding in Anderson stands for the proposition that the lack of a goodwill term in a forbearance letter is dispositive. What this Court said is, neither of the forbearances granted by the bank board in this case relates to the acquisition of goodwill. If the bank board had wanted to permit such depreciation of goodwill, it knew how to do so. That's at 1357. So, it's basically the canon of construction, express your willingness as excludes your alternatives. You've got a goodwill request and you've got a forbearance request. You've got a grant, but none of it involves goodwill. Now, the trial court, in fact, erroneously states that the transaction did not involve forbearance, and that's at A000016. And that's flat out wrong, as Judge Shaw has observed. The forbearances are clearly enumerated. Moreover, the trial court's entire analysis, which is on summary judgment, is contained in one single sentence. It's really a conclusory sentence that the court finds in that contract. So, given that, and given the fact that there's no support for the alleged contract, the court should reverse on that issue. Turning to the measure of damages, the court relied on an equity value as a measure of the thrift's actual value. And, as I mentioned, that was Sua Spahn. The plaintiffs and the government's experts both agreed that stock value is not a good To your knowledge, and I've poked around in preparation for the cases, in various cases that have talked about damages, but in your view, can you think of any one decision that kind of lays out the road map for damages in these Windstar cases? I believe the Glendale decision, it identifies basically the three real types of damages in each contract case. You've got lost profits, restitution, and reliance. And the plaintiffs brought restitution and lost profits claims, which the trial court rejected as, I mean, they saw over a billion dollars in damages. The trial court rejected those as being completely unfounded. So, the award of the entire thrift value, that's not to be found in any case law. That's something completely new. When the plaintiffs are the thrift, it's a different discussion if the plaintiffs are the shareholder, but they're not in this case. The thrift is the entity that's suing. You're saying this, and I realize that the slavery decision was tabbed in. I guess that talks about the shareholder premium, right, for the control loan. It does talk about control premium. But is that the only case, and is this the only case that has awarded a control premium, and is this the only case that has gone on the stock value? I believe the answer is yes and yes, Your Honor. I'm not aware of any other case that offered a control premium. And I'm quite certain that there's no other Winstar case where a thrift was given its own value as damages. So, in fact, I'm not familiar with any other breach of contract. Does one of the cases talk about expectancy damages? Is that lost profits? Lost profits is a subset of expectancy. So, expectancy is whatever is necessary to give someone their expectation back. And I misspoke when I said lost profits. I meant the entire category is expectancy, Your Honor. And in this case, the… Why isn't the stock market approach a legitimate one? I mean, Professor Verschel's expert report indicates that it is in light of the public information. And your brief makes a good point of pointing out hidden losses and improper asset allocations or valuations and things. Why? I mean, we have to give the trial court great deference in the methodological approach they take to these damages cases. Abuse of discretion. Yes, Your Honor. So, given the evidence, even from your own expert, that indicates that the stock market value approach isn't necessarily a bad one, why isn't the answer to defer to that methodology but then indicate, as you point out, that that's not the be-all and end-all you have to take into account, things that weren't in the public domain, which clearly affects the ultimate price? Your Honor, the stock itself, the thrift doesn't own its stock. So, the best that it could be is that it's sort of a stand-in for lost profit, that this is what the thrift might have been worth some time ago. It's a proxy for the value. The court's trying to come up with a way to value the value of the thrift the day before and the day after. And it's a proxy for value. And I think it's a perfectly legitimate proxy for value, and Professor Fischel says as much, value insofar as if, for example, suppose there were no hidden assets, hidden liabilities, nothing along those lines, it would actually probably be a perfect proxy for value. Your Honor, just to go on what you say, because immediately after the breach, the thrift's value rose up to $5.88. Until, yeah, until you told them they couldn't averagize goodwill. Obviously, people just didn't realize the impact FIREA was going to have on this particular company. But that's exactly, not to interrupt your Honor, but that's exactly why the stock price is not such a good measurement of value, because it takes into account a lot of other things. Well, sure, you could always point that out, but you could point all those other things out. You can tell the court which things it doesn't account for, and the corking factor goes to 10. Your Honor, it is an imprecise way. We think a better tool. What your Honor is saying, he's not inaccurate. None of these measures are precise, counsel. But a better way is to measure the actual anticipated. I mean, basically what the court would be doing is leading it up to the market to determine what the value of the institution is, as opposed to leading it up to the court to figure out based on expected cash flow. It's not that it can't be done, Your Honor, but it has never been done. And it would have to be adjusted and corrected. I don't think they're suggesting the court wouldn't be determining the value, but rather that this ought to be the starting point or could possibly be the starting point for determining the value. And then, of course, the court would have to factor in things that would impact whether it's a true assessment. But it would still be the court assessing it, not the market assessing it. But you've got to start from somewhere. If the court—I guess the answer then, Your Honor, would be it could be. It would depend on what the court did from that starting point. I'm not sure if the other side got that. Thank you, Your Honor. May it please the Court. Ashley Doherty for the FDIC. I will be taking two minutes, if my voice doesn't give out, to make what I hope will be two very brief points. The first will be extremely brief, which is just to remind the court, as all parties agree in this case, it's not a matter of dispute, that since the FDIC stands in the shoes of the defunct Thrift, that any damages awarded in this case will go to the FDIC as a matter of first instance for distribution. Since the receiver has managed to turn the Thrift profitable, any net proceeds will end up with the shareholder plaintiffs, but they will have to pay to the FDIC first. And my second point is addressed solely to the litigation defense, because that goes to the conduct of the FDIC as receiver. The government has argued that because the FDIC was able, after 10 years, to turn this into a profitable receivership, that therefore they should not pay damages, even if there was a contract, even if they broke it, and even if they caused an injury to the Thrift. That is not correct, and nor is it seeking a double recovery. The reason it's not correct is the correct test is set forth in this court's LaSalle decision, which says very clearly that remote and unrelated activities and profits do not count as mitigation in goodwill tests, in goodwill cases. The court there is reciting a general mitigation test as set forth by Judge Justice Holmes in the Southern Railway case and in the restatement, but in light of Judge Moore's question about the lack of interest in these cases, I might point out that it's particularly applicable that we apply this rule in this case, because otherwise delay rewards defendants, which it should not do. So the conduct of the FDIC as receiver, and eventually turning this case profitable, was basically the result of successful financial management and negotiating a really good settlement with the Internal Revenue Service. The receivership is not profitable until 10 years later and under LaSalle, that is too remote and too unrelated to count as mitigation. Also, mitigation is a defense. The burden is on the government to prove it. It's a heavy burden, and they have not met that burden in this case. All right, thank you. Good morning, Your Honors, and may it please the Court. According to the government's own documents, Benj's acquisition of Equitable was caught at the request of the Federal Home Loan Bank of Seattle, and that's at the Appendix 200-106. In this context, the focal point of the liability inquiry is whether or not there exists something more than a naked application for merger and an approval. Mr. Dinscher says there was no goodwill forbearance and presumes that's the end of the inquiry. That has not been the inquiry of this Court. Indeed, this Court, in the Fifth Third case and the LaVon case, found a contract because there was something more when there was no forbearance letter relating to the issue of goodwill. There are three independent reasons why there is something more here. First, the record evidence, which we set forth in the brief, shows that the use and the necessity of the purchase method of accounting was at the epicenter of these negotiations, and that's the standard that was also used by LaVon. And I would point out both that the May 12, 1982, proposal at A400-164 and Benj's business plan, September 24, 1982, at A300-194, made clear that Benj's ability of achieving break-even and profitability was dependent on getting the purchase method of accounting. And then there are many, many documents that specifically deal with the need for the 40-year amortization period. There was an August 12, 1982, letter from Benj's outside consultants, Kaplan Smith, saying that we needed the amortization period to be 40 years. Are you saying, then, that even though it wasn't reflected in the approval document that we discussed with Mr. Dinsel, did you have any contracts applied in fact with respect to these other provisions? Well, I think the goodwill 40-year amortization. I believe the jurisprudence of this Court still calls it an express contract, even though it comes from many different documents. So that's the only thing I would quibble with. But the answer is, is there a contract? Yes, there's a contract. Because this Court has to take into consideration, as the trial court did, all of the facts and circumstances and all of the documents. We have a cloud of evidence. We have to stand and thank, and this Court has to thank, the Schuylkill case. We did not winch our case, but it took the evidence, a cloud of evidence, for example, that the military retirees always received free health care as part of their compensation, as part of recruiting. All of that was not sufficient to admit to the need of contract. And you said this Court said that in fact. Why would this case be a kind of a more lenient for you? Well, I'm submitting three different independent reasons why there's something more. One, again, relying on Fifth Third, Le Bon, Cal Fed. The documents here do reflect specifically negotiations and an agreement. I would also point out, of course, in addition to the documents, I'd like to... Well, that and the other case I just mentioned. Are you familiar with that case by any chance? I'm not familiar. Well, then, go ahead and make your argument. It's not just with that case. But having said that, let me also offer two other reasons and I'll get back to the documents. One is we've got regulator affidavits in this case, just like they did in Le Bon, just like they did in Fifth Third, that specifically said that we never could have approved this deal and would not approve this deal, but for the amortization period and but for the agreement that goodwill could be treated as an asset for regulatory purposes. Why was that then not put into the approval document? Because we have that document that we were discussing with Mr. Dimson, I think, at 169... Well, it's 40,000... 169, I guess. Why was that not put into it? If it's a part of the agreement, put it in there. There's no question about it. And that's been a question in all these goodwill cases. I wish they had. It certainly would make the exercise a whole lot easier. The question, of course, is was it necessary in order for there to be a finding in the contract? And I believe the case law from this court is it's not necessary. I also point to the 1986 conversion of the institution. At that point, there was 36 years left in the amortization period. Mr. Wynwood Campbell of the Federal Home Loan Bank Board specifically said, under these new regulations, we could not approve anything more than a total of 25 years goodwill amortization. Since Benj had already used four years of goodwill amortization, there could only be 21 years left. But the affidavits reflect that, in fact, they negotiated a 28-year amortization period precisely because the Federal Home Loan Bank Board recognized that there was a contract, that they could not unilaterally impose a different amortization period. I guess this case, I mean, it seems to basically come down. On the one hand, you've got the cases that you cited, too, about Fifth Third, Long Bed, South. On the other hand, there are the cases on the other side about D&N and Anderson. We just kind of, I guess, have to look at the facts here to see on which side of the fence it falls, right? Isn't that kind of the exercise? Well, you certainly have to determine which it's closer to. Agreed. But I believe that this is clearly distinguishable from what I would call the bad cases. As this court said in Fifth Third, distinguishing Fifth Third from D&N, it says about D&N, none of the documents proffered by D&N mention goodwill or the accounting treatment thereof. The bank board supervisory agent testified in this deposition that he could not recall any discussions with D&N about goodwill. This is just the opposite. There were discussions after discussions. We have testimony. We said it from Mr. Love, from Mr. Campbell, from Mr. Smith, that this wasn't the epicenter of this negotiation. In addition, this court in Fifth Third said about Anderson, in an internal federal home loan bank board memorandum, the FHLBB staff recommended against granting the request for extended amortization of goodwill, but recommended approval of the other forbearance requests. So there they actually recommended against, as opposed to approvingly. Here, that is in Anderson, according to the memorandum, Westport's CEO indicated that a goodwill forbearance was not necessary for completion of the transaction. So let me ask you just to, if you're, I think, as best I can recall, you actively recited some of the other cases. Let me ask you, if I could, at this time, this tweeting, these proceeds. It's the same housekeeping question that I asked Mr. Dinser. If we affirm on the liability, we have to address the damages and tensions, obviously. What if we disagree with you on the liability issue? Mr. Dinser says that all of those liability, I'm sorry, all of those damages issues relating to valuation of the company, the premiums, the controlling stock, all of that drops out. Well, I respectfully disagree with Mr. Dinser. We never had to litigate damages separately, so we would want the opportunity to be able to do that.  but I would respectfully disagree with Mr. Dinser. What should happen if, obviously, if we affirm that we have to talk about damages, assume for the moment, hypothetically, we were to reverse on liability, what, if anything, would we have to say about damages? Well, I think you would have to remand, right, and have the court consider the impact of the breach of the Western contract. Oh, no, that I think is correct. I don't, but we wouldn't have to, we wouldn't have to address these damages issues that are now before us. Right, I think it would be our burden to show that these theories were also applied in the case of a sole breach of the sole contract. The Western contract. Yeah, exactly. Okay. There were two recent cases that the government finally noticed, a 20-H.A. letter. The first Federal of Lincoln case and the Muller Development case. And again, in those cases, this court found that there was no negotiation. And I've mentioned Mr. Linwood-Campbell several times that A4000-74 and 75, he was being asked about the purchase method of accounting. And he's asked, after receiving these letters, did you review and pass on the reasonableness of the projections? He says, yes, I did. I rejected them. He goes on to say, I received new analysis based on general accepted accounting principles. I received additional information from Katherine and Smith, et cetera, et cetera. A lot of back and forth before he pronounced himself satisfied. Judge Moore, you raised the issue a little bit earlier on the issue of these so-called hidden losses. Let me just briefly address that issue. And that is, I agree and we have set forth in the brief what the standard is on review. And that is, it is abusive discretion. Very specifically, when we're talking about damages, the methodology used to calculate the award is reviewed for abusive discretion. That's from home savings. On the issue of the hidden losses, the so-called hidden losses, three quick points. One is, no one is accusing Benj of hiding anything. The question was whether or not these, in fact, were losses. And as of the date of the breach, there was no disagreement as of that date by the in-house accountants or by the regulators at that time that there were unrecognized losses. This was something after the fact, after liquidation, as we're getting into litigation. At that point, the government's going through all these records and begins to argue, well, some of this stuff, based on these regulations, have to be mark-to-market, which might depress some of the value of the assets. But the last point is, nor does the market value take into consideration what we would call hidden gains. And we mentioned in our reply memorandum that the contemporaneous records make clear that Benj Management had planned to roll over more than $700 million in long-term and higher-interest loans comprised principally of the Federal Home Loan Bank Seattle Advances with yields between 10% and 15%. They would have yielded an 80% I'm sorry, an $80 million gain. At some point, we have to look at the issue of reasonableness and the reasonableness of the trial court's judgment. When the trial court here said that the damages were patently insufficient, maybe Benj couldn't prove lost profits in the amount of $944 million. But Benj surely is entitled to the value of the institution as determined by the market. And in the brief, which we'll rely on, we also, of course, were asking for the control premium as well as $50 million as an add-on for the taxes that we were forced to pay that we would not have had to pay but for the breach of contract. Thank you. I don't want to pounce on you here, but it is limited time, and I just have one question. When, at his time of argument, Mr. Bloom said, yes, there's nothing in the document, the approval, about goodwill and 40-year amortization, but he went on to point to several other things that he said support the fact based on our jurisprudence was a contract. One of them were, by this, two things. The statement of Mr. Falstich at $40,031 and the statement of Mr. Walpert at $40,059. And I guess, in particular, he hanged his hat on Mr. Falstich, who really does seem to talk about goodwill and 40-year amortization as being part of the package. What is your response to his reliance on those two items in particular? Well, two things, Your Honor. First, there was no trial. So this was only declarations. There was no ability to judge the witness. Second, going to Mr. Falstich at A4087, he says that he didn't talk to people at Benjamin Franklin or at Goodwill. He can't recall any discussion. So this is not him engaging in a back-and-forth with them. This is... At best, what he had in mind. Yes. At best, and who knows the basis because there wasn't a trial. So that is... This is exactly the type of cloud of evidence that the Court was talking about in Sweden. And the... I mean, in that case, Your Honor, as you know, you had discussions with recruiters. I mean, there was actual, verified discussion. And still, that was still part of a cloud of evidence. The... My colleague at the bar says that this is a question in all goodwill cases. It's not in the sense that we had a forbearance letter that didn't have the terms. CalFed, all the forbearance letters had goodwill terms. And in one of those forbearance letters was issued 28 days after the forbearance letter in this case. That one in CalFed had the term. So the Federal Home Owned Bank knew how to give that term if it wanted to. The primary cases Plankett-DeLisle, Fifth Third and Levin, there were no forbearances at all. So it was a completely different kind of case. In this case, when you have documents that say X and you have a cloud that says, hmm, then the documents win. In fact, the cloud can't trump the documents ever. Counsel, do you think that since Judge Smith ruled on this in summary judgment that we should be dedicating a remanding for a potential trial on the issue of whether there's a contract? I think a trial would definitely be necessary to find the existence of a contract because the plaintiffs rely on the cloud. We don't. We rely on the documents and I believe the court can find based on the document that there is not a... To the extent that we were willing to take into account Faustus's affidavit or things like it, to the extent that we didn't agree with the government's argument that only contemporaneous documents can be considered to ascertain whether there is a contract or not, would that then result in us needing to send this back for a trial? I believe that even the post-contemporaneous  Your Honor, support our position like the plaintiff's offering circular in 1986 identifies the forbearances that they received in both transactions. What about Faustus's testimony? Your Honor... How many editions have you seen? Mr. Faustus never says there was a goodwill contract. He says things like I wouldn't have approved the deal without a long-term amortization. Well, we know that the regulations allow for that even without a contract. So, none of what he says is a... There is a contract. But even, let's say, hypothetically, he said there is a contract. I think that the documents trump. If, Your Honor, find that the documents don't trump, yes, we would need a trial. I mean, the cloud can't beat the documents. But if the cloud is to be given anything, it has to be given a trial. Just one very quick question. This case basically went off in the sum of the judgment,  Completely. Except for the damages, Your Honor. Right. The liability. Your Honor, and I know I'm over time, if I could just have two sentences on the surplus since I haven't had a chance to address it just to make sure the Court understands more. The liability is free from that, so let's move on to your brief, Your Honor. Thank you, Your Honor. Thank you. Thank you, Your Honor. Thank you.